IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ROBERT ALLEN VALLADARES,

Defendant

Criminal No.:  ELH-20-0448
Related Civil No.:  ELH-22-03252

**MEMORANDUM OPINION**

Defendant Robert Allen Valladares pled guilty to one count of distribution of a controlled substance, *i.e.*, fentanyl, and two counts of possession with intent to distribute, for which he received a total sentence of twelve years of imprisonment.  The charges are rooted in the death of 29-year-old Shawn Woods, who died from a drug overdose after obtaining drugs from the defendant.  Valladares has filed a post-conviction motion under 18 U.S.C. § 2255 ( ECF 38), which is supported by a memorandum.  ECF 38-1 (collectively, the "Motion").

In the Motion, Valladares raises multiple claims.  Although defendant was extremely contrite at sentencing, he now denies responsibility for the death of Mr. Woods.  Therefore, he contends, *inter alia*, that the advisory sentencing guidelines were calculated incorrectly, because they were predicated on the victim's death.  He also claims that the court abused its discretion in considering the advisory sentencing guidelines.  And, he argues that the charges were flawed.  The government opposes the Motion.  ECF 45.  Defendant has replied.  ECF 46.

No hearing is necessary.  For the reasons that follow, I shall deny the Motion.

## I.      Factual Background

Defendant was indicted on December 10, 2020.  ECF 1.  Count One of the Indictment charged distribution of controlled substances on February 7, 2020, *i.e.*, fentanyl, despropionyl fentanyl, acryl fentanyl, and methamphetamine, resulting in death, in violation of 21 U.S.C. §

841(a)(1).  In Count Two and Count Three, defendant was charged with possession with intent to distribute fentanyl on two different dates, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C). A conviction under Count One would have required a mandatory minimum sentence of 20 years of imprisonment, with a maximum of life imprisonment.

Plea negotiations ensued, and an Information was filed.  *See* ECF 19.  Thereafter, on October 21, 2021, pursuant to a Plea Agreement (ECF 23), defendant entered a plea of guilty to the Information.  ECF 27.  Count One of the Information charged distribution of fentanyl, despropionyl fentanyl, acryl fentanyl, and methamphetamine on February 7, 2020, but it omitted the "death resulted" language.  Count Two charged possession with intent to distribute fentanyl on February 13, 2020, and Count Three charged possession with intent to distribute fentanyl on May 19, 2020.  Each count carries a maximum penalty of twenty years of imprisonment.  *See* ECF 23, ¶ 3.

The Plea Agreement set forth the elements of each offense.  ECF 23, ¶ 2.  The parties also addressed the anticipated calculation of the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  The parties contemplated an offense level of 12 for each drug count, based on the drug quantity.  ECF 23, ¶ 6(a), (b), (c).  And, the counts grouped, with a combined offense level of 12.  *Id.* ¶ 6(d).  However, under § 5K2.1, the parties agreed to an upward departure level of 38, because the death of Shawn Woods resulted from the use of drugs distributed to him by defendant. *Id.* ¶ 6(e).[1]  After three deductions under U.S.S.G. § 3E1.1, the parties agreed that defendant had a final offense level of 35.  *Id.* ¶ 6(g).

---

[1] In ¶ 6(e) of the Plea Agreement, the parties did not cite U.S.S.G. § 2D1.1(a)(2), which expressly assigns an offense level of 38 under the facts attendant here.

Notably, defendant's plea of guilty was entered under Fed. R. Crim. P. 11(c)(1)(C). *Id.* ¶ 10 ("C Plea"). In particular, the parties agreed to a sentence ranging between 132 months and 168 months of imprisonment as the appropriate disposition. *Id.* ¶¶ 9, 10.

The Plea Agreement included a lengthy "Stipulation of Facts." *Id.* at 10-12 (the "Stipulation"). Defendant signed both the Plea Agreement and the Stipulation. ECF 23 at 9, 12.

The Stipulation provides, in part, as follows, *id.* at 10:

> Beginning in December of 2019, the Cecil County Drug Task Force received reliable information from a confidential informant that a subject known as "Rob Valley" was a heroin dealer in Cecil County. Investigators had already identified "Rob Valley" as Robert Allen Valladares, born in 1984 and residing at . . . Elkton, Maryland. A confidential informant provided "Rob's" cell phone number as . . . .

> Investigators identified a second cellphone number for Valladares when a confidential source reported that his/her relative is an addict who gets drugs from "Rob Valley" . . . .

> On February 8, 2020, at approximately 9:28 a.m., the Elkton Police Department was dispatched to [a residence in] Elkton, Maryland in reference to an overdoes death. Upon arrival, Officer Brown made contact with the victim's father, who stated that his 29-year-old son was upstairs in his bedroom, deceased, and he believed that his son overdosed. . . . Emergency medical services arrived and pronounced the victim deceased at 9:33 a.m.

> Officers observed two empty wax bags stamped "Facetime" laying on the victim's bed. Next to the wax bags was an uncapped syringe that appeared to have blood in it. Officers further seized four cell phones that were located throughout the victim's bedroom.

> Investigators learned that the victim was recently discharged from a recovery house in Bel Air and appeared to his family to be doing well. The night before the victim's body was found, February 7th, around 6 p.m., the victim asked his father to take him to his friend "Rob's house" so he could obtain suboxone strips. According to the victim's father, the victim recently left a rehabilitation facility, and, although he was provided suboxone strips, the victim ran out. The victim's father drove the victim to "Rob's house" . . . . The victim's father knew the Defendant and had met him previously. According to the victim's father, upon arriving at the Defendant's residence, the victim went inside for approximately two minutes and returned to his father's vehicle. . . .

The Stipulation continues, *id.* at 11:

> On February 10, 2020, at 1430 hours, the Cecil County Drug Task Force Heroin Coordinator, Raymond Lynn, responded to the Elkton Police Department and took possession of the four cell phones seized from the victim's bedroom. Lynn examined the phones and found that one of the victim's cell phones, a Samsung model SM-J260T1, with IMEI: 356212/10/562439/0 (Item #3), was active during the fatal overdose. A Cellebrite forensic data extraction of the Samsung cell phone revealed the following communications on February 7, 2020, the night that the victim went to the Defendant's residence:

| | |
|---|---|
| 2200 hrs | The victim placed an outgoing call to the Defendant's cell phone 443-907-9662 that lasted 28 seconds. |
| 2206 hrs | The victim sent a text message to the Defendant, "Dad is bringing me so we gotta keep it on the low." |
| 2216 hrs | The Defendant texted the victim, "I'm inside." |

Law enforcement executed a search warrant at Valladares's residence on February 13, 2020. ECF 23 at 11. They recovered fentanyl and drug paraphernalia. *Id.* Notably, the fentanyl was in blue wax bags stamped "Facetime." *Id.* Those bags matched the bags recovered from the victim's bed.

An autopsy was performed on the victim on February 9, 2020. *Id.* The medical examiner determined that the cause of death was drug intoxication with acryl fentanyl, fentanyl, desproprionyl fentanyl, methamphetamine, and xylazine. *Id.*

A traffic stop was conducted on May 4, 2020, as to a vehicle leaving the defendant's residence. *Id.* Baggies of suspected fentanyl were recovered from the vehicle. *Id.* This led to a search of defendant's home, pursuant to a warrant, on May 19, 2020. At that time, 38 bags of fentanyl were recovered. *Id.* at 12.

Of relevance here, the Stipulation states, *id.* at 11: "The Defendant admits that on February 7, 2020, he distributed controlled substances to the victim, and that the death of the victim resulted."

Defendant was placed under oath at his guilty plea proceeding, held pursuant to Fed. R. Crim. P. 11. *See* ECF 45-1 (Transcript of 10/21/21) at 2. The Court explained to defendant the significance of the oath. *Id.* at 4. Defendant indicated that he had discussed the case in full with his lawyer, *id.* at 8, and he was "A hundred percent" satisfied with counsel's work. *Id.*

The Court carefully reviewed the entire Plea Agreement with the defendant, including the concept of "grouping" under the Guidelines. *See* ECF 45-1 at 18. As to grouping, the Court said, *id.*

> Now there's a concept in the guidelines known as grouping, Mr. Valladares, and it happens to apply here. Counts One, Two and Three are grouped under Section 3D1.2(d), and at least the way I'm looking at it, that's a good thing for you because the total offense level for all three counts remains a 12 as a result of this grouping principle. So far did you follow that?

The defendant replied in the affirmative. ECF 45-1 at 18.

In addition, the Court advised the defendant of "a significant upward departure" in his offense level, to 38, "because of the death of S.W. resulting from [defendant's] conduct." *Id.* Defendant again indicated that he understood. *Id.*

The government orally presented a factual summary, consistent with the Stipulation in the Plea Agreement. *Id.* at 35-38. And, the defendant agreed that it was accurate. *Id.* at 38.

Sentencing was held on January 7, 2022. ECF 35; *see* ECF 45-2 (Transcript of 1/7/22). Neither side had any objections to the Presentence Report ("PSR," ECF 28). *See* ECF 45-2 at 3-4. Therefore, the Court adopted the Guidelines calculations in the PSR. ECF 45-2 at 5; *see* ECF 28, ¶¶ 24-34, 51-52, 97. In particular, the defendant had a base offense level of 38, as agreed to in the Plea Agreement and a final offense level of 35. In addition, he had a criminal history score of 18 points, which equates to a criminal history category of VI. That is the most serious criminal

history category.  With a final offense level of 35 and a criminal history category of IV, defendant had an advisory sentencing Guidelines range of 292 to 365 months of imprisonment.  *Id.*

Defense counsel sought to convince the Court to impose a sentence at the low end of the C Plea range.  In particular, defense counsel maintained that the defendant is "extremely remorseful."  ECF 45-2 at 19.  Then, to underscore the point, she added that he is "extremely, extremely remorseful."  *Id.* at 20.  Therefore, defense counsel asked the Court to consider a sentence of "11 to 12 years."  *Id.* at 26.

The father of the decedent also spoke.  *Id.* at 11.  Remarkably, he asked the Court to sentence the defendant to 11 years of imprisonment, *i.e.*, the bottom of the C Plea range.  *Id.* at 12.

The defendant chose to allocute.  He expressed profound remorse for the victim's death and then said:  "I take full responsibility."  ECF 45-2 at 21.

The defendant also read a letter he had written to the victim's family.  *Id.*  He noted that he and the victim were friends, and that the death of his friend has been "devastating . . . ."  *Id.*  Defendant also said:  "I never wanted to hurt anyone, and words cannot describe the anguish I feel for my actions."  *Id.*

Ultimately, the Court sentenced defendant to a total term of 12 years of incarceration, *i.e.*, 144 months.  ECF 36.  That sentence was towards the lower end of the C Plea range, and well below the advisory Guidelines range.

In contrast to the defendant's remorse and acceptance of responsibility at sentencing, defendant now asserts:  "I was not responsible for [the victim's] death."  ECF 38 at 9; *id.* at 4 (stating defendant is not responsible for victim's death).  Indeed, defendant maintains that the government "had no case whatsoever against Defendant that would have made him responsible for the death."  ECF 38-1 at 2.  And, he claims that the victim is to blame for his own demise,

because of the victim's "irresponsibility" in "recklessly combining a deadly mix of chemicals. . . ." *Id.*

Defendant also states, *id.* at 3:  "It was not the Defendant's responsibility to school the victim on the deadly consequences if the victim would mix fentanyl with other dangerous elements."  And, he adds that it is "regrettable that the victim's irresponsibility caused him to mix a trace of fentanyl with other ingredients . . . ."  *Id.* at 6.  Defendant also disputes that he provided the victim with methamphetamine, xylazine, or "multiple versions" of fentanyl.  *Id.* at 3. And, contrary to what defendant said at his sentencing, he now asserts, *id.* at 6:  "The Defendant had no intent to take responsibility for the victim's death."

## II.  Legal Standard

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). And, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"

*United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428).  In order to prevail on a § 2255 motion, a movant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence.  *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003); *see United States v. Faulls*, 821 F.3d 502, 507-08 (4th Cir. 2016). Such a claim is not barred under § 2255.  Moreover, such claims ordinarily are not litigated on direct appeal. Generally, such claims are litigated in a § 2255 action to allow for development of the record. *Massaro*, 538 U.S. at 504-

8

06 (2003); *United States v. Ladson*, 793 F. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).  Thus, claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also Ladson*, 793 F. App'x at 203.

Generally, the rule governing procedural default of claims brought under § 2255 precludes consideration of any contentions that "'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Pettiford*, 612 F.3d at 280 (quoting *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999).  Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see Dretke*, 541 U.S. at 393; *Massaro*, 538 U.S. at 505; *see also Reed*, 512 U.S. at 354 (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Murray*, 477 U.S. at 496; *Frady*, 456 U.S. at 167-68.

In order to show cause for not raising the claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded their counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel").  Additionally, the alleged error cannot simply create a possibility of prejudice, but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error

of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original).  Pursuant to the Supreme Court's ruling in *Carrier*, 477 U.S. at 494, prejudice does not support relief of a procedural default in the absence of a showing of cause.  *See also Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

The actual innocence exception "only applies in limited circumstances."  *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014).  Indeed, it must be "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *Carrier*, 477 U.S. at 496.

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623.  Notably, the petitioner must meet this burden by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 494.  In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 758 F.3d at 583; *see Bousley*, 523 U.S. at 623.

As the Fourth Circuit has said, "[a] valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298

(quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)).  It is an "exacting standard," based on a "'holistic judgment about all the evidence'. . . ." *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

In reviewing the Motion, the Court is mindful that a self-represented litigant is generally "held to a 'less stringent standard' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Quintero v. Garland*, 998 F.3d 612, 634 (4th Cir. 2021) (same); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same).

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief . . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. LeMaster*, 403 F.3d 216, 220-23 (4th Cir. 2005); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Ordinarily, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim . . . ." *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).

In my view, no hearing is necessary here, because there are no colorable claims, nor is credibility at issue.

### III.  Discussion

### A.  Ineffective Assistance of Counsel

The government asserts that "Valladeres does not allege ineffective assistance of counsel." ECF 45 at 5.  To be sure, Valladeres does not expressly do so.  However, he makes a handful of assertions that impugn his lawyer's performance and advice.  *See*, *e.g.*, ECF 38 at 9 (complaining about lawyer's advice with respect to the plea); ECF 38-1 at 5 (complaining about his lawyer's failure to address the grouping issue).  Moreover, the § 2255 form asks if there is any other ground that has not been presented.  Referencing his attorney, defendant responded, in part, ECF 38 at 9: "She kept telling me this was the best offer the government would make.  Had I known all the facts I would have taken this case to trial."  He adds, *id.*:  "I did not know that my attorney could have objected to any thing."

Therefore, in an abundance of caution, I shall assume that the Motion includes a claim of ineffective assistance of counsel.

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017). Ineffective assistance of counsel is a well recognized basis for relief under collateral attack. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States*

*v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *United States v. Akande*, 956 F.3d 257, 260 (4th Cir. 2020); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149*; United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see also United States v. Richardson*, 820 F. App'x 225, 226 (4th Cir. 2020) (per curiam); *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence. *Mayhew*, 995 F.3d at 176; *Pettiford*, 612 F.3d at 277.

The first *Strickland* prong, known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Richardson*, 820 F. App'x at 225; *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 580 U.S. at 118; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting Strickland's high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 580 U.S. at 118 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).  Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).  Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

In this case, defendant entered a plea of guilty, pursuant to a Plea Agreement.  The Sixth Amendment right to counsel extends to the plea-bargaining process. *McMann v. Richardson*, 397 U.S. 749, 771 (1970); *United States v. Murillo*, 927 F.3d 808, 815 (4th Cir. 2019); *United States v. Hall*, 771 App'x 226, 227 (4th Cir. 2019) (per curiam); *see also Frye*, 566 U.S. at 140-44; *Lafler*, 566 U.S. at 162.  And, of relevance here, a plea agreement is regarded as "an essential aspect of the administration of criminal justice . . . ." *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011).

In *Hill v. Lockhart*, *supra*, 474 U.S. 52, the Supreme Court explained that, "where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness [and intelligence] of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"  *Id.* at 56 (citation omitted). But, in assessing whether counsel's performance was deficient, courts adopt a "strong

presumption" that counsel's actions fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Of import here, the prejudice prong of the *Strickland* test is "slightly modified" in the context of plea bargaining. *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988). In *Hooper*, the Fourth Circuit explained, *id.* (quoting *Hill*, 474 U.S. at 59): "When a defendant challenges a conviction entered after a guilty plea, [the] 'prejudice' prong of the [*Strickland*] test is slightly modified. Such a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Accord Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000); *see also Richardson*, 820 F. App'x at 226.

*Hooper*, 845 F.2d 471, is illustrative. There, the defendant, who had a history of mental illness, pled guilty in a Virginia court to second-degree murder. *Id.* at 472. However, his lawyers failed to obtain a psychiatric evaluation before the defendant's entry of the guilty plea. *Id.* Hooper subsequently filed a habeas corpus petition, which the district court denied. *Id*. On appeal, the Fourth Circuit noted that the "burden is on Hooper to establish a reasonable probability that if his lawyers had obtained a psychiatric report, he would have rejected the plea agreement" and gone to trial. *Id.* at 475.

The Fourth Circuit examined a psychiatric report obtained after the guilty plea against the background of the circumstances Hooper faced at the time he decided to plead guilty. The Court was not persuaded that the report provided evidence sufficient to establish a reasonable probability that Hooper would have declined the plea agreement and gone to trial, even if his counsel had obtained a psychiatric report at the time. *Id.* at 475-76. Although the Court concluded that the failure to obtain a psychiatric report fell below the objective standard of reasonableness established

by *Strickland*, it was satisfied that Hooper was not prejudiced because there was no reasonable probability that the deficiency changed the outcome of the proceeding.

Notably, the defendant has the burden to establish a reasonable probability that, but for counsel's deficient performance, he would not have entered a plea of guilty. *Murillo*, 927 F.3d at 817. Even assuming that defendant asserts ineffective assistance of counsel here, there is no basis on which to find a reasonable probability that he would have rejected the plea deal if his lawyer had done anything differently. His bald assertion that he "would have taken this case to trial" if he had "known all the facts," ECF 38 at 9, is not sufficient, particularly given his statements under oath, discussed next.

### B. The Significance of the Guilty Plea

As noted, defendant entered a plea of guilty. At that time, he was under oath to tell the truth. ECF 45-1 at 2. Significantly, although the defendant did not plead guilty to the charge that the drugs he distributed to the victim resulted in the victim's death, he admitted to those facts, under oath.

A guilty plea is a "waiver of [a defendant's] right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). It is "a grave and solemn act . . . ." *Id.* Therefore, in order for a guilty plea to be valid, it must be voluntary. *Id.* And, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.*; *see Bradshall v. Stumpf*, 545 U.S. 175, 183 (2005) (same). Thus, the plea of guilty must reflect an "intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

A plea cannot be "voluntary in the sense that it constituted an intelligent admission . . . unless respondent received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)).  However, the Supreme Court clarified in *Marshall v. Lonberger*, 459 U.S. 422, 436 (1983), that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Marshall*, 459 U.S. at 436 (1983) (quoting *Henderson*, 426 U.S. at 647) (internal quotations omitted).

Of import here, a defendant is "bound," absent clear and convincing evidence to the contrary, "by the representations he made under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.,* 956 F.2d 1290, 1299 (4th Cir. 1992); *see Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977); *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005). Indeed, "a defendant's solemn declarations in open court affirming a [plea] agreement . . . 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74). Therefore, conclusory allegations in a § 2255 petition that are contrary to testimony provided at a Rule 11 hearing are "palpably incredible and patently frivolous or false." *Lemaster*, 403 F.3d at 222. As the Fourth Circuit has explained, "courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." *Id.*; *see also Blackledge,* 431 U.S. at 74; *White*, 366 F.3d at 295-96; *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003).

The Fourth Circuit has acknowledged that, on post-conviction, a defendant who has pled guilty "has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true." *Murillo*, 927 F.3d at 815; *cf. Lee v. United States*, 582 U.S. 357, 369 (2017) ("Courts should not upset a plea solely because of *post*

*hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies."). Therefore, "to prevent criminal defendants with bargainer's remorse, from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 927 F.3d at 816. In particular, the defendant "must point to evidence that demonstrates a reasonable probability that, with an accurate understanding of the implications of pleading guilty, he would have rejected the deal." *Id.* Here, defendant does not "point to evidence" that undermines his knowing and voluntary decision to plead guilty based on a complete "understanding of the implications of pleading guilty . . . ." *Id.*

In the context of a plea bargain, "the defendant is the master of the outcome." *Murillo*, 927 F.3d at 815. Therefore, "[t]he prejudice analysis in the context of the plea-bargaining process requires a fact-based evaluation of the weight of the evidence." *Id.* at 815. Notably, the "plea agreement language and sworn statements must be considered in their context[.]" *Id.* at 817; *see Lemaster*, 403 F.3d at 221-22; ECF 45-1 at 38-39.

Defendant expressly admitted that on February 7, 2020, he distributed drugs to the victim that resulted in the victim's death. *Id.* at 37. His attempt here to dispute that assertion is groundless.

### C.  Grounds One, Two, Three, and Four

In his Motion, defendant asserts four grounds for relief.

In Ground One, defendant challenges the "'grouping'" of offenses under U.S.S.G. § 3D1.2(d). ECF 38 at 4. He maintains that the conduct in Counts One, Two, and Three "was not all part of the same transaction, and should not have been applied aggregately." *Id.*; *see also* ECF 38-1 at 3.

In addition, defendant denies that he "plead to, nor was he responsible for the death of the 'victim' . . . ." ECF 38 at 4.  Therefore, he claims that the death enhancement under U.S.S.G. § 5K2.1 was improper.  ECF 38 at 4.

In Ground Two, defendant contends that the "PSR was never changed to reflect the new superceded charges," which did not include the "resulting in death charge."  *Id.* at 5; *see* ECF 38-1 at 6.  Thus, he argues that the Guidelines range of 292 to 365 months of incarceration was incorrect.  ECF 38 at 5.

In Ground Three, defendant complains that the Court abused its discretion by incorrectly considering the Guidelines, which were improperly computed.  ECF 38 at 7; ECF 38-1 at 8.

In Ground Four, defendant asserts, *inter alia*, that both his arrest and his Indictment were "flawed."  ECF 38 at 8; ECF 38-1 at 12.  He explains, in part, ECF 38 at 8:  "The government did not know the quantity (weight) or the substance in Count 3."  He adds that the amount of fentanyl recovered from him was "miniscule" and "for personal use."  *Id.*

### 1.  Grouping

In his Memorandum (ECF 38-1), defendant complains about the grouping, claiming that the three counts "were not all a part of the same course of conduct or common scheme . . ."  *Id.* at 2.  He insists that the grouping was "misused."  *Id.* at 4.  And, he complains that his "attorney never saw any of this."  *Id.* at 5.

Defendant misunderstands the principle of grouping. U.S.S.G. § 3D1.1 provides:  "When a defendant has been convicted of more than one count, the court shall group the counts into distinct groups of Closely Related Counts ('Groups') by applying the rules specified in § 3D1.2."  Some offenses do not group.  *See* U.S.S.G. § 3D1.1(b).  But, in general, "counts involving substantially the same harm shall be grouped together . . . ."  U.S.S.G. § 3D1.2.

Notably, the grouping here had no impact on the initial base offense level or the final offense level insofar as the drug quantity was concerned.  The offense level began at 12, was a 12 for each count, and remained at 12 even after grouping.  Therefore, Valladares was not prejudiced by grouping the counts of conviction.  But, it was the resulting in death aspect of Valladares's conduct, not grouping, that ultimately determined defendant's base offense level of 38.

## 2.  Presentence Report

Valladares argues that the Presentence Report incorrectly reflected the Guidelines associated with a drug distribution resulting in death, even though that was not an offense in the Information, nor was he convicted of the offense.  ECF 38-1 at 6.

As discussed, defendant was initially charged with drug distribution resulting in death.  *See* ECF 1 (Count One).  The Information (ECF 19) was the obvious product of plea bargaining.  As a result, defendant was able to avoid a mandatory minimum sentence of 20 years, with a maximum term of life imprisonment, which is the sentence he faced if convicted of Count One in the Indictment.  Moreover, as the government explains, ECF 45 at 9, "Valladares ignores the fact that he admitted at his guilty plea hearing and in his signed plea agreement that his actions resulted in the death of Shawn Woods, justifying an upward departure to 38 pursuant to [U.S.S.G. §] 5K2.1."

The PSR (ECF 28) expressly relies on U.S.S.G. § 2D1.1(a)(2) to arrive at a base offense level of 38.  *See id.* ¶ 25.  It expressly provides for a base offense level of 38 "if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C) . . . and the offense of conviction establishes that death or serious bodily injury resulted from the use of a substance[.]"

Defendant's counts of conviction were founded on 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  It is true that the actual count of conviction did not charge the death of the victim.  But, the offense level was properly calculated at 38 by virtue of the Plea Agreement and the

Stipulation, in which Valladares admitted that his conduct in selling drugs to the victim resulted in the death of the victim *and* that an upward departure to 38 was appropriate.

Valladares's position would upend the role of plea bargaining. Defendant was able to avoid a potential life sentence, as well as a mandatory minimum term of imprisonment for Count One, by way of the government's willingness to proceed on the Information, which omitted that charge. In exchange for the concession, the parties agreed to Guidelines calculations that were based on the actual facts. Defendant cannot use a § 2255 motion to make an end run around his Plea Agreement.

Valladares and his counsel had the opportunity to object to any inaccuracies in the PSR. No objections were made. *See* ECF 45-2 at 3-4.; Fed. R. Crim. Proc. 32(f)(1). The facts in the PSR are consistent with the Stipulation.

### 3. Court's Consideration of the Sentencing Guidelines

Valladares maintains that the court abused its discretion when it considered the advisory sentencing Guidelines, because the Guidelines were based on inaccurate information. ECF 38 at 7; ECF 38-1 at 8. He advances arguments concerning drug quantities and weights and aggregate quantities. *Id.* For example, he states that, "[b]y aggregating the 3 counts together the government triple counted the [drug] weight . . . ." ECF 38-1 at 8. He also accuses the government of "'slight of hand'" in its "method of using § 3D1.2(d) . . . ." *Id.* at 9. The government counters that the contentions are "irrelevant with the upward departure under [§] 5K2.1 and [§] 2D1.1(a)(2)." ECF 45 at 10.

The Court adopted the calculations in the PSR, without objection. *See* ECF 45-2 at 3-5. And, I carefully reviewed them with the defendant. *Id.* at 5-9. *See* ECF 45-2. The Guidelines

called for a sentence ranging from 292 to 365 months. *Id.* at 9. In contrast, the C Plea called for a far shorter sentence, ranging from 132 months to 168 months.

To be sure, the Guidelines "serve an important role" in the sentencing "framework established by Congress." *Rosales-Mireles v. United States*, ___ U.S. ___, 138 S. Ct. 1897, 1903 (2018). Ascertaining the Guidelines range can be a "'complex' undertaking." *Rosales-Mireles*, 138 S. Ct. at 1904 (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). And, the district court must "remain cognizant" of the Guidelines "'throughout the sentencing process.'" *Rosales-Mireles*, 138 S.Ct. at 1904 (quoting *Peugh v. United States*, 569 U.S. 530, 541 (2013) (other quotations marks and citation omitted).

Notably, the district court has the "ultimate responsibility" to ensure that the calculation of the Guidelines is accurate. *Rosales-Mireles*, 138 S. Ct. at 1904. Of course, mistakes may occur. *Id.* Moreover, although the Guidelines are merely advisory, a sentencing court must consider them at sentencing. *United States v. Perez-Pend*, 453 F.3d 236, 241 (4th Cir. 2006); *United States v. Hughes*, 401 F.3d 540, 556 (4th Cir. 2005).

Defendant reiterates that he did not plead to the death count, and therefore the Guidelines were incorrect and the court should not have considered them. However, pursuant to the Stipulation in the Plea Agreement, defendant admitted to the conduct that resulted in the victim's death. And, a sentencing court can consider uncharged or acquitted conduct in determining the Guidelines range. *See United States v. Medley*, 34 F.4th 326, 335 (4th Cir. 2022); *United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir. 2009), *cert. denied*, 559 U.S. 1002 (2010); *United States v. Ashworth*, 139 F. App'x 525, 527 (4th Cir. 2005) (per curiam). The conduct must, however, be established by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 157 (1997); *Medley* at 335. It was.

*United States v. McKinnie*, 21 F.4th 283 (4th Cir. 2021), is relevant.  There, the defendant sold fentanyl to the victim, who subsequently died of a drug overdose.  *Id.* at 286.  In exchange for the dismissal of the death charge, the defendant pleaded guilty to distribution.  *Id.* at 287.  The court imposed an upward variance and departure, and sentenced the defendant to 120 months.  *Id.* at 286.  As in this case, prior to an enhancement, the defendant had an offense level of 12, which did not take the victim's death into account.  *Id.* at 288.

Notably, the *McKinnie* Court said, *id.* at 290:  "Evidence of causation, even if it does not meet the but-for standard, is clearly relevant to the circumstances and seriousness of an offense and may thus properly be considered under the § 3553(a) variance analysis."

Moreover, the Court found the sentence reasonable under 18 U.S.C. § 3553(a).  *Id.* at 292. It said, *id.* at 294:  "The opioid epidemic has wrought a terrible toll on our nation and so many communities within it . . . . When drug dealers knowingly ply their customers with what could well be lethal doses, district courts do not abuse their discretion by taking behavior simultaneously destructive of society an individual life into account."

In sum, no Guidelines error occurred here.  But, in any event, the C Plea range was well below the Guidelines range, and the Court imposed a sentence at the low end of the C Plea range. In other words, whether or not the Guidelines were correct, the Court did not base the sentence on the Guidelines.

### 4.  Ground Four

Valladeres contends that both his arrest and the Indictment were "flawed."  ECF 38 at 8; ECF 38-1 at 12.  He also characterizes the Indictment as "bogus."  ECF 38-1 at 13.  Defendant asserts that the substance in the 38 bags recovered in May 2020 was not tested or weighed.  *Id.*

And, he contends that there was no "link" between the 38 bags found on May 19, 2020, and what was found in the victim's blood.  *Id.* at 12.

Moreover, defendant maintains that no jury would have convicted him based on an unknown substance or drug quantity.  *Id.* at 13.  And, he states that if he had gone to trial, the case would have been dismissed for lack of evidence.  *Id.* at 13.

Much of defendant's criticisms are directed to the initial charges brought by the State of Maryland.  *See*, *e.g.*, ECF 38-1 at 12.  Those charges are beside the point.  That case was not pursued.

To the extent that defendant takes issue with the federal case, including the Indictment, he pleaded to the Information, not the Indictment.  And, he had ample opportunity to challenge the proceedings.  Defendant's suggestion that there was no probable cause to arrest him is patently frivolous.  Indeed, the evidence against him was powerful.

A review of the Rule 11 transcript reveals that the defendant understood the charges; was fully satisfied with the services of his able lawyer; was apprised of his various constitutional rights; he waived any defenses that he may have had; and he knowingly and voluntarily waived his constitutional rights.  Notably, he also agreed that the factual summary presented by the government was accurate.  And, the defendant made clear that he desired to plead guilty, and that he did so freely and voluntarily.

## IV.  Conclusion

This case illustrates the proverbial notion of "buyer's remorse."  I see no basis for relief.

## V.  Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant as to a post conviction claim.

A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

As indicated, a COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Valladeres has not made a substantial showing of the denial of his constitutional rights.  Therefore, I decline to issue a COA.[2]

An Order follows, consistent with this Memorandum.


Date:   September 15, 2023                                      _____/s/_____
                                                               Ellen L. Hollander
                                                               United States District Judge

---

[2] The denial of a COA by the district court does not preclude Cole from seeking a COA from the appellate court, *i.e.*, the United States Court of Appeals for the Fourth Circuit.